STATE OF IOWA, Appellee, v. ADDIE MINELLA, Appellant.

APPEAL AND ERROR: Briefs—Overpresentation. The practice of
1  overpresenting a point on appeal by a flood of authorities on ele-
   mentary principles of law, or by a like citation of authorities
   which have but shadowy, if any, application, is strongly discouraged.

HOMICIDE: Defense of Another—Belief of Accused—Knowledge of
2  One Assaulted. The honest and reasonable viewpoint of one who
   claims to have killed in defense of another controls, not the knowl-
   edge of such other that he was not in danger.

HOMICIDE: Defense of Another—Belief of Accused—Limiting Ver-
3  dict to Manslaughter. If the accused committed a homicide in
   the honest and reasonable belief that another was about to be
   killed, or to receive great bodily injury, he is entitled to an abso-
   lute acquittal, *irrespective of any other findings by the jury*. It
   follows that in such a case it is fundamentally erroneous to in-
   struct (a) that, if the one defended was not, in truth, in any such
   danger, and (b) that, if deliberation, premeditation and malice
   aforethought be lacking, the verdict could not be above man-
   slaughter.

HOMICIDE: Defense of Another—Evidence—Ancient Threats and
4  Assaults. Antecedent threats and assaults in the presence of the
   accused, made by deceased against and upon the one assaulted,
   *even though very remote, in point of time, from the fatal encounter*,
   are admissible as bearing on the state of mind of the accused when
   the fatal shot was fired, especially when such prior threats and
   assaults are of the same nature as those occurring at the time of
   the fatal encounter. So held where the threats and assaults were
   made six years prior to the killing of deceased.

HOMICIDE: Defense of Another—Evidence—Belief of Accused—
5  Conclusion. Defendant, on trial for homicide, but claiming that
   she shot in defense of another, may testify directly, *as an allow-
   able conclusion*, as to her belief and apprehension that such other
   was in danger of being killed or of suffering some great bodily
   injury.

TRIAL: Reception of Evidence—Objections—Conclusions—Homicide.
6  A question not on its face calling for a conclusion should not be
   excluded on that ground. Motion to strike is the proper practice
   if an objectionable conclusion be stated.

PRINCIPLE APPLIED: Defendant was on trial for killing her husband, but claimed she fired in defense of her son. *Held*, the following questions were improperly excluded as calling for conclusions:

1. Whether she (defendant) ever heard deceased make any threats against her son.

2. Whether she saw deceased pursuing the son with a razor.

3. Whether she had, on a certain occasion, accused the deceased of trying to kill the son.

4. What was the occasion of the son's leaving home on a certain occasion.

5. What reason she had for believing the deceased would kill the son.

**HOMICIDE:** Defense of Another—Evidence—Belief of Accused—
7 Reasons for Belief—Conclusions. Objectionable conclusions are not called for by asking one who is defending a homicide on the ground of having fired in defense of another, to detail the *reasons* for believing that deceased was about to kill such other person and to detail the facts and circumstances *supporting* such belief.

PRINCIPLE APPLIED: Defendant was on trial for homicide, and was defending on the plea that she fired in defense of her son. The following questions were held proper:

1. What made you think the deceased would kill your boy?

2. What reason did you have for believing that deceased would kill your son?

3. What facts did you know of that caused you to believe that deceased would kill your son?

4. What circumstances did you know of in the previous relations between deceased and your son that caused you to believe that deceased would kill your son?

**TRIAL:** Reception of Evidence—Objections to Answer Without Mo-
8 tion to Strike—Effect. Sustaining an objection which was interposed to a question after it was answered, as effectually removes the answer from the record and from the jury as though there had been a motion to strike the answer.

**HOMICIDE:** Malice Aforethought—Lack of Malice—Evidence. Be-
9 cause of irrelevancy and immateriality, it is not available to a defendant accused of a homicide to show that, soon after the homicide, defendant gave to an outsider directions to take possession of everything and directions ''as to how the body of deceased should be put away.''

**EVIDENCE:** Acts, Declarations and Conversations—Introduction of
10 Part—Effect. The introduction of part of a conversation by one party arms the other party with the right to introduce any omitted

part of the conversation. So held in a homicide case as to a conversation had with defendant shortly ·after the killing. (Section 4615, Code, 1897.)

APPEAL AND ERROR: Harmless Error—Erroneous Exclusion of
11 Evidence. The erroneous exclusion of evidence on cross-examination is rendered harmless by the neglect of the injured party to avail himself of the excluded evidence when the same witness, concededly non-hostile, is later called as his own witness.

HOMICIDE: Defense of Another—Evidence—Burden of Proof. The
12 State has the burden of proof to show that defendant, on trial for homicide, did not act in defense of another. Instructions reviewed, and held to meet this rule.

EVIDENCE: Res Gestæ—Ultimate Test—Spontaneity—Logical Re-
13 lation. The ultimate test by which to determine whether proffered testimony is *res gestæ* is, (a) spontaneity, and (b) logical relation of the offered testimony to the main event.

EVIDENCE: Res Gestæ—Improper Limitation—Impeachment. That
14 which is *res gestæ* is always *substantive* evidence of the matters stated. Limiting its effect, in the present case, to impeaching purposes, was error.

CRIMINAL LAW: Instructions—Advice and Caution—Disparage-
15 ment of Defense—Self-Defense. It is the right and duty of the court, when necessary in the interest of justice, to give such advisory and cautionary instructions to the jury as to the *nature of a defense* as will enable the jury to reach a true and just verdict.

PRINCIPLE APPLIED: The following instruction is approved: "That the defense of self-defense, and the evidence relating thereto, should be carefully scrutinized, and considered and weighed by the jury, to the end that, if an accused was in fact acting in self-defense, he should not be found guilty, but, if he was not acting in self-defense, then a due regard for the ends of justice and peace and welfare of society demand that persons guilty of crime may not make use of that plea as a means of defeating justice, and to protect them from criminal responsibility for a violation of the criminal statutes of our state."

CRIMINAL LAW: Defenses—Indirect Extrajudicial Confessions of
16 Another. Indirect extrajudicial confessions of another cannot aid an accused,—for instance, that such other, (a) immediately after the shooting of deceased, was seen on the premises with a revolver in his hand, (b) was subsequently accused of the crime, and (c) has fled the jurisdiction of the court.

**HOMICIDE:** Instructions—Guilt of One Other Than Accused—At-
tendant Acts. Even though accused relies on the plea of justifi-
able homicide, yet, on the question of who fired the *fatal* shot, the
jury should, by proper instructions, be directed, if request is made,
to consider the acts of others, intimately related to and attending
the acts of accused. So held where another than accused was
present when accused fired at deceased, had a revolver in his hand
immediately after the said shooting, shortly thereafter hid certain
cartridges, and, later, denied having had possession of said articles.

*Appeal from Monroe District Court.*—F. M. HUNTER, Judge.

THURSDAY, JUNE 29, 1916.

INDICTMENT charging murder in the first degree. Con-
viction of murder in the second degree. Defendant appeals.
—*Reversed.*

*W. E. Giltner* and *N. E. Kendall,* for appellant.

*George Cosson,* Attorney General, *Charles E. Miller,*
County Attorney, *David W. Bates* and *J. C. Mabry,* for
appellee.

SALINGER, J.—I. It is first complained that the rule
which permits one to kill in defense of another if he honestly
and reasonably, though mistakenly, believes that, else, the one
apparently threatened will suffer injury or
death, was, and should not have been, quali-
fied by adding that the belief or knowledge
of the one defending should be considered in
determining whether the fear on part of the defender was
justified. For the claim that such qualification constitutes
error, 41 cases are cited. Of these, 15 have no bearing on
the point; 16 are to the effect that one acting in self-defense
may act on appearances, and that the question is not whether
he be actually in danger, but whether he has acted reasonably
upon an honest and justified belief that he is; 7 hold that this
is the rule in the defense of a relative or other person; 1 is

1. APPEAL AND
ERROR: briefs:
over-presen-
tation.

that the justice of the fear may not be shown by opinion testimony; another, that accused may testify as to the state of his feelings when he acted; still another deals with what former acts of deceased are admissible on whether accused acted reasonably. In citations to support other points made, these rules are affirmed in 20 more cases. This, the gleaning out of the 61 citations, has little bearing upon whether what is urged to be is error. The omitting these citations would have greatly lightened our labors without impairing the chances for a correct decision of the appeal. For these citations do little more than to declare well-settled law, which, so far as relevant, we could have been persuaded to adhere to without being subjected to the examination of an army of books. When all is done, we are, practically, still forced to deal with the assignment as presenting an open question.

The opinion will develop that what was done on this point was also done as to most of the matters urged upon us. We feel constrained, in self-defense and in defense of the rights of litigants, to say that which we hope will tend to discourage such practice. There are two bad paymasters, one who pays before anything is due, and one who does not pay though payment be due. Underpresentation deprives us of proper aid to consideration. Overpresentation dissipates and wastes the time and energies of this court when every ounce of either is precious because of the tremendous volume of business submitted to us. Of course, if needless citations show upon their face that they are needless, the injury would be limited to waste of time on part of presenter, and the wrong done the court and all who suffer when it is thus wronged, would be minimized. The trouble is that usually the claim is made that the citations sustain one side of a material controversy, and it is only after the cases are examined that it can be known that they do not so sustain it, or that they give it a support which it does not need. It assumes the aspect of that test between mushrooms and toadstools, which is that, if the eater is killed, it was toadstools. On this method of presentation,

we are usually unable to ascertain that our time and energy have been wasted, except at the expense of first wasting them.

II. As to what is involved in said first complaint, Instruction 31 is:

If the jury find that deceased was not armed with a razor, and was not assaulting the son of accused in such manner as, if not prevented, would be likely to cause death or inflict upon him some great bodily injury, and if the son "at that immediate time knew, or as a reasonably prudent and cautious person should have known, that he was not in such peril or danger, then defendant was not justified in shooting or killing" deceased, and no verdict in her favor should be returned.

2. HOMICIDE: defense of another: belief of accused: knowledge of one assaulted.

If the jury could find that defendant honestly and reasonably believed that her husband was about to kill her son unless she shot, the homicide resulting was justified, even though the son knew at the time, or should have known, that he was in no deadly peril. The instruction violates the elementary rule that the honest and reasonable viewpoint of the *accused* controls. If the defendant may be convicted because of the knowledge or belief of another who is apparently threatened, the mental attitude of the accused is of no importance. If this charge may be upheld, then, should father and son, as a practical joke, make the mother believe that the son was about to be killed by shooting,—if the mother, spurred by an irresistible and justified agony of fear, interfered and killed the husband,—she may be convicted of murder because the others knew that the gun pointed at the son was not loaded. No matter what others knew, as to her, the unloaded gun must be dealt with as a deadly weapon.

2.

The essence of another part of this instruction is:
If she thought and believed, when she fired the shot, that

her son was in deadly peril, and the jury finds he .was not, and fails to find that the shooting .was deliberate, premeditated and done with malice aforethought, then the verdict cannot go above manslaughter.

3. HOMICIDE: defense of another: belief of accused: limiting verdict to manslaughter.

Without a finding that defendant acted in justified fear, she was entitled to an acquittal of anything above manslaughter if it should be found that deliberation, premeditation and malice aforethought were absent. A finding that she was justified in. reason to fear for the life of her son, and acted justifiably in the light of that fear, entitled her to an acquittal even though the fear was in fact not justified. The instruction errs in that it rules that, if the jury makes a finding which requires an acquittal, and another which should stop the verdict at some point below murder, the two findings together have no effect beyond prohibiting a verdict above manslaughter.

III.   The defendant testified that she knew deceased always hated Charley, and that she heard him at different times express his disregard and ill will toward Charley. She was then asked whether she ever heard him make any threats against her son. To this, objection was sustained that it was an opinion and conclusion of the witness.

4. HOMICIDE: defense of another: evidence: ancient threats and assaults.

Next, she was asked whether she knew, of her own personal knowledge, that deceased, at a time prior to this homicide, had made an assault upon Charley with a razor. Answer to this was excluded, on the objection that it was incompetent, irrelevant and immaterial. To whether at any time when they lived on a farm, spoken of as six years ago, she saw deceased pursuing Charley, ''running him with a razor,'' the State objected that it was incompetent, irrelevant and collateral. Counsel for the. defense explained that it was offered on whether the conduct of defendant was that of a reasonably prudent and cautious person; but the objection was sustained.

Defendant then testified that she remembered the occasion that caused the son to leave while they were on the farm. She was then asked when and what was the occasion that caused him to leave home. Objection that this was immaterial, incompetent, too remote and called for the opinion and conclusion of the witness, was sustained. Witness then stated that she was present right at the time when he left. To whether deceased at that time said anything to her about what he intended to do to Charley, objection that it was incompetent, immaterial, irrelevant and too remote was sustained. The same objection was sustained to the question what, if any, threats witness heard deceased make at that time as to what he would do in the way of taking the son's life if he caught him. And the same objection was sustained to the question whether witness, and on that occasion, saw deceased after the son Charley with a razor, pursuing him. To whether defendant, on another occasion, when she lived at Hamilton, before she lived on this farm, accused deceased of trying to kill the son, the objection that it was incompetent, called for the opinion and conclusion of the witness, and was too remote, was sustained. So of the question whether defendant, in the presence of a brother of deceased, who was in court, had accused deceased of trying to kill this son.

The effect of all this was to exclude testimony of threats against and assaults upon Charley made mostly some six years before the homicide, and of some made longer before.

In support of an assignment that this proposed testimony of previous threats against and assaults upon the son was erroneously excluded, we have another flood of authorities. As we understand it, the State justifies the exclusion on the grounds that the time is too remote, and that the proposed testimony was or would be made up of objectionable conclusions. Nevertheless, appellant cites 8 cases in this and in other jurisdictions, which cases merely announce that, as a general rule, previous threats by and past conduct of deceased are admissible. 30 more deal with conduct and threats

so recently prior to the homicide as that no one would assert that they should be excluded for remoteness. All of them deal with conduct closer to the act in inquiry than the limit which the State urges. 5 hold that time is of no consequence if the acts continue or were repeated, or when they are intimately connected with the circumstances leading up to the homicide. 19 assert that, as a general rule, remoteness goes to weight, but affects neither competency nor admissibility.

The essence of one of the State's arguments for the exclusions is remoteness in time, to wit, a lapse of 6 years. This theory, which, in a way, creates a species of statute of limitations on the effect that prior conduct may produce upon the mind, overlooks that courts should be slow to say as matter of law that an old threat exercised no influence upon the mind of him who heard it, when he sees violence about to be committed by him who threatened upon the one who was threatened; and that the rule which the State urges confessedly does not apply where the threats are repeated. It is fair argument to the jury that threats made long ago were followed by years of inaction, and that one who urges that they affected his state of mind was, therefore, not thus affected, but it is an entirely different matter to lay down as a law rule that threats did not operate upon the minds of those who heard them because some stated time had elapsed since the threat. We are not prepared to hold as matter of law that, if one hears a third person threatened, or sees him assaulted, and years thereafter sees the threatened person assaulted by the one who made the threats, the older acts had no effect upon the mind of the one who interfered, and who claims to have done so because influenced by the past. And the State has not been fortunate in its citations upon this head. At least, what it cites is not persuasive for the proposition advanced. Though great stress is laid upon *Goodwin v. State*, 96 Ind. 550, threats made 30 years before were

therein received. It is pointed out that the defense omits from the quotation of the case the paragraph that:

"There was other evidence of long continued hostility of the accused towards the deceased."

It is true this adds, by way of argument for admitting the 30-year-old threats, the existence of said hostility, and that, therefore, the case is perhaps not strictly an authority for the naked proposition that threats may be considered though made 30 years before. On the other hand, the State quotes from it, apparently without appreciation of the effect of what is quoted. The case holds that:

"The existence and continuance of malevolent feelings was a question of fact, and it was proper to submit to the jury all evidence bearing upon that question, leaving to them the decision of its credibility and weight," and that "threats against life are always admissible against an accused, but their remoteness from the time of the homicide is a circumstance to be considered in determining the weight and effect to be assigned them," and that "it cannot be said as matter of law that ill-will may not begin in boyhood and continue into the years of manhood."

We cannot agree with the deductions made from this by the State, that:

"It is a strong case for the rule for which we contend, namely: that remote threats are only admissible when connected with the main transaction by showing intervening and oft-occurring quarrels, disputes or threats, but only when so connected."

In our view, the *Goodwin* case declares the self-evident proposition that prior threats are no more to be excluded as matter of law than to be received as justification as matter of law; and that the age and remoteness of the threats bear only upon their probative value, and not upon their admissibility. Nor can we agree with the interpretation given *Commonwealth v. Quinn,* 150 Mass. 401. Passing that the sufficiency of challenging the testimony is involved, the case is one in

which threats made three years ago were admitted, and the defendant complained of admission instead of exclusion. True, the court, speaking to this record, says that its admission rests largely in the discretion of the trial court. That, as said, speaks to a case where the testimony was admitted, and all the other testimony received appeared with it, and where it did thus appear whether or not this undoubted discretion had been abused. In the instant case, the threats and assaults made, if any, were not permitted to be spoken to, and, the exclusion being in violation of general rules of evidence, we should not be asked to hold as matter of law that sound judicial discretion was not violated by the exclusion. That we are right in saying that a general rule of law was breached is once more sustained by the *Quinn* case, which holds squarely that:

"The lapse of time would not render the evidence legally incompetent. Its effect would be upon the weight to be given to the evidence, in view of all the circumstances."

As said, it is in this connection, and with the testimony received and complained of, that the court says that the having received it rests largely in the discretion of the trial court.

We are not able to find from *Atkins v. State*, 16 Ark. 568, that previous threats are not admissible except where they are recent and are accompanied by acts which indicate an intention to execute the threatened purpose. Its first germane point is that, where a witness testifies to slighting remarks made by the defendant against the deceased, it was error to exclude, on the objection of the State, what circumstances, or what that deceased had said about defendant, led up to the remarks of the latter. It is said that the object of the State, in proving the declarations of the prisoner against the deceased, was doubtless to show malice, and that, if these declarations fell from the prisoner in consequence of any irritating or provoking remarks, the witness should have been permitted to state that fact to the jury; that the jury might have attached more or less consequence to a full under-

standing of the circumstances under which they were made; that it was their province to determine whether the declarations of the prisoner, made upon the occasion, were indicative of settled malice toward the deceased, or merely a temporary ebullition of feeling arising upon the provocation of the moment; and that:

"While it is the province of the court to exercise a sound discretion in the exclusion of irrelevant matter, it is safest to let in any competent testimony that may tend to throw light upon the motives of the accused in making such declarations."

The next holding is that evidence of threats made by the deceased against the prisoner are inadmissible in his defense unless there be proof they were communicated to him before the homicide. At page 585, speaking to excluding the opinion of a witness who was a by-stander, and excluding same, it is said:

"The doctrine on this subject is this: Where the question is whether a party acted prudently, wisely, or in good faith, the information on which he acted, whether true or false, is original and material evidence. And that portion of the proof which was received comes strictly within the rule, but the part excluded was the opinion only of the witness. . . . 'Had young Hudgins informed his father that Anderson was advancing in great haste, apparently much enraged, that he was using threats of personal violence, armed with a weapon, and the like, all this would be admissible to satisfy the jury that the homicide was in self-defense. The *opinion* of the witness is a very different thing. It would be dangerous in the extreme to permit the belief of anyone, whether sincere or feigned, much more the offspring of the accused, to afford a pretext for taking human life.' "

See *Hudgins v. State of Georgia*, 2 Kelly (Ga.) 173, 181, and *State v. Goodrich*, 19 Vermont 116.

Nor does the case of *Pitman v. State*, 22 Ark. 354, seem to us to support the argument advanced by the State upon it.

It does not hold that threats made long before can be rejected as matter of law, but that, if threats and declarations of hostile purpose and feeling are made recently before, and there is conduct indicative of intent to execute, such threats are admissible evidence as bearing on *res gestæ*, though the threats were not communicated to the defendant. In other words, it does not touch the question of probative weight of remote threats, but puts recent threats, coupled with something that evinces an intention to act upon them, into the class of *res gestæ* evidence, and dispenses, therefore, with the usual requirement for the admissibility of threats,—communication to the one threatened or claiming to have been influenced by the threats. We are constrained to say that, notwithstanding any summary attempted of these two Arkansas cases by *Wiggins v. People,* 93 U. S. 465, at 485; the holdings of these cases have been by us fully and correctly exhibited.

It is somewhat difficult to understand *Daniel v. State,* 103 Ga. 202, and it is conceded that it appears to be in conflict with *Brown v. State,* 51 Ga. 502, and *Starke v. State,* 81 Ga. 593. The most we can make of it is that, upon the question whether an assult was malicious, there should be that put in which indicates a hostile disposition for some length of time, and some continuity in reaching the affray under investigation. We are loath to follow this Georgia decision, and on the record here to apply it to solving whether this defendant, a mother, was influenced into fatally shooting her husband, with whom there appears to have been no other cause of quarrel, and to hold as matter of law that the threats and assaults upon the son did not influence her, on the ground that they occurred a long time before, and were not continuous up to the time of this homicide.

In *State v. Cross,* 68 Iowa, at 191, we sustain the striking out of testimony by the defendant to the angry appearance of the deceased on a certain occasion when he was conversing

with him about three years prior to the homicide, and without argument rest this holding upon *State v. Sullivan*, 51 Iowa, at 144. In that case we say:

"But ill will of deceased and former quarrels could have nothing whatever to do with defendant's peril. However hostile deceased may have been, and however many quarrels and affrays the parties may have had, if deceased by his acts and arms did not threaten peril to defendant, he would not be authorized by the law to infer peril on account of ill will or prior contests."

There was complaint of an instruction that, where one assaults another, such person so assaulted has a lawful right to use a sufficient amount of force to resist such assault and compel the person so assaulting to desist therefrom; but, where one person is assaulted by another, it is not lawful for the person so assaulted to use a deadly weapon in his defense unless such an assault was made with such a weapon or in such a manner as would cause a person of ordinary courage and prudence to believe that he was in imminent peril of losing his life or receiving bodily injury. It was insisted that this instruction should have been modified by permitting the jury to consider the circumstances surrounding the defendant, and the situation, as well as his knowledge of previous occurrences and the ill will of defendant, to determine whether, in the exercise of ordinary courage or prudence, he was authorized to believe he was in imminent peril to life or of great bodily injury. We dispose of the complaint by saying that it is very plain that ordinary prudence cannot be exercised without regarding the condition and surrounding circumstances of the party called upon to act; that these things must be considered from very necessity, and the jury could not understand the instruction differently. It is quite apparent that we deal purely with this complaint of this instruction, and refuse to inject into such an instruction that there should be considered conduct in the past, although it was of such nature, and conditions such at the time of the

homicide, as that the law would not authorize the defendant to infer peril. If there be any doubt that the rule here asserted is not foreclosed in the *Sullivan* case, it is resolved against by the fact that, in that trial, a witness who testified that he was a justice of the peace, and that defendant had been arrested and recognized to keep the peace toward decedent and his family, was permitted to give threats made at the time against deceased. We say:

"It is insisted that the testimony of this witness is incompetent. So far as the evidence related to the threats it was surely admissible to show the defendant's feelings and disposition towards the deceased. Whatever the witness said in regard to the arrest and proceedings against defendant, it was, we think, proper to identify the time and explain the circumstances under which the threats were made. Other evidences of threats made by defendant at the same time were correctly admitted in evidence."

In *State v. Perigo*, 70 Iowa, at 667, it was held that a quarrel about a year before the killing might properly be considered in determining the weight to be given the evidence, but, though remote, it could not be determined as matter of law that defendant was not actuated in the transaction by the feelings which had been engendered by the former occurrence. That there was a lapse of more than one year here does not obviate the *Perigo* case, but merely adds to the weakness of the evidence. In the first volume of his book on the law of Evidence, Section 108, Mr. Wigmore says that the element of fixedness is lacking and the probative value disappears when threats were made so long before that the design could not *possibly* be supposed to have continued throughout the interval; but that no mere distance of time in itself should make the threats irrelevant; that a design once formed presumably continues.

If it be true that neither these authorities nor any of those we have commented upon, sustain, and that perhaps there are no authorities which sustain, the abstract proposi-

tion that conduct more than six years past, unconnected with the homicide in consideration, and unrepeated, is admissible, that is not decisive. And in this case, the absence of such authority is immaterial for a reason of its own. For here we have the conduct and threats of some six years prior to the homicide, coupled with conduct occurring either immediately before or in connection with the homicide which is of the same class as the older conduct. Whatever may be the rule on showing the naked fact that, years before, A pursued B with a razor, and threatened to kill him, when he who saw and heard this proposes to testify that it influenced him when he saw A attack B with a razor, such testimony is admissible under any rule which the State asserts. And the actual situation is fairly that of the supposed case. After testimony of the threats in the presence of deceased's brother had been excluded, and before defendant said she thought her husband would kill her boy because he had him in the corner, which was excluded on objection made after answer was made, this occurred:

Defendant said that, when she came back from the closet, she heard quarreling in the front part of the house; that when she heard this she went from the kitchen to the room where the stove was, towards the parlor; that, as she was thus passing, she heard "little Charley" say, "You wouldn't hurt me, and me a cripple, would you?" that her husband said, "I have a damned notion to kill you;" and that Nellie Smiley screamed, or someone did, "He has got a razor;" and that, when she heard what she has described, she thought he would kill her boy and she had no other idea.

After exclusion of an answer concerning other facts within her knowledge which contributed to make her believe her son was in danger at that time, this occurred:

Defendant testified that, as she passed the door leading from the parlor into the little south bedroom, she saw Charley and her husband in there; the husband had the son up against the wall, and was in front of the son with his

hand raised with a razor in it; that, when she saw that, in connection with what she had heard, she believed her son's life was in imminent danger; that he was her youngest, and she knew he was crippled when he was a baby.

We are convinced that the exclusion was erroneous.

## 2.

As to the position on objectionable conclusions, it can only mean: first, that, if the testimony had been admitted, it would be vulnerable to that objection; and second, that for the purposes of sustaining this claim, we must in some manner assume what the testimony would have been had it been taken. It is quite probable the witness would have said, in terms, that certain things were threatened, and that, therefore, she labored under fear for the safety of the son. Conclusions are permissible where the matter cannot be readily reproduced or described to the jury as it appeared at the time. *Rothrock v. City of Cedar Rapids,* 128 Iowa 252. In 6 Encyc. of Evidence, page 763, it is said that the witness may testify as to what he thought the deceased intended to do. *Bailey v. People* (Colo.), 130 Pac. 832, at 833, holds that evidence as to the defendant's state of mind, and as to his apprehension of the designs of the deceased, is admissible. On page 760 of 6 Encyc. of Evidence, it is said defendant may testify directly as to his belief and apprehension at the time of the homicide that he was in great danger from the deceased, and this though the evidence does not show that he had reasonable ground for such belief. Accused may testify that he believed his father was in danger of death, or great bodily harm, and that he shot in his defense because he believed it to be necessary to save his life. *State v. Foster* (Tenn.), 49 S. W. 747. A statement that accused looked "kinder worried" is admissible. *State v. Bradley* (Vt.), 24 Atl. 1053. And a statement as to whether parties

5. HOMICIDE: defense of another: evidence: belief of accused: conclusion.

quarreled is competent (21 Cyc. 929) ; and that an arrangement was made the day before, which called decedent on proper business to the place where he was killed. *State v. Jones,* 64 Iowa 349. And *State v. Austin* (La.), 29 So. 23, is that the accused may state the facts transpiring just prior to and at the time of the killing, and the further fact that, because of these circumstances, he entertained then and there the belief that his brother was about to be killed and acted under that belief; but the defense may not go further and enter upon the inquiry as to the nature and character of this belief, because this is a matter of opinion and trenches upon the domain of the jury.

We cannot see how *Gibson v. Burlington, C. R. & N. R. Co.,* 107 Iowa 596, aids the State. It holds that, where a witness testifies he saw the accident, and at request of one of the defendant's officials, went to the latter's office, exclusion of evidence as to why he went and as to any conversation he had with such official was proper, there being nothing to show that the evidence was either relevant or competent.

In a word, the State admits it to be the rule "that the defendant may testify directly to his belief and apprehension at the time of the homicide that he was in immediate great bodily danger from the deceased, even though the evidence shows that he had no reasonable ground for such belief, and may give his reasons therefor." The avoidance is that these reasons "cannot be expressed as conclusions, but must be a recital of the prior acts and conduct of the deceased which leads the defendant to belief that he was about to suffer death or great bodily injury." The State finally makes it clear that the sole objection is that the acts were so remote in point of time from the commission of the offense as that they were rightly excluded.

Self-evidently, no sound argument for the objection that testimony is an unwarranted conclusion of the witness can

be even initiated by merely assuming that the proposed testimony would be of that character. It is not denied that, on the issue of self-defense, evidence of certain acts of hostility to the person whom defendant is attempting to protect is admissible, but asserted that "the facts and incidents must be recited, and not the conclusion of the defendant as to why he believed his life or the life of the person he claims to have been protecting was in danger." If this were the law, and we have attempted to show that .it is not, it is still assumed that, if the questions had been permitted to be answered, the witness would have stated nothing but such conclusions. She might have said that she had seen the husband try to stab the son or to aim a loaded gun at him, and that she felt that shooting could be prevented only by her act. To be sure, evidence in effect that was received, but the essential complaint is that questions which sought to elicit whether ·there was not more were not permitted to be answered; and the State does not make the point that the exclusion was harmless error because such evidence was received, and could not well do so. If there was more, the jury was entitled to hear it, and give it such weight as it saw fit; and it might have thought that which was excluded, and which was along the same lines as that which had been received, was of greater probative value than that which it was permitted to hear.

6. Trial: reception of evidence: objections: conclusions: homicide.

IV. It is claimed there was error in refusing to allow defendant to detail her reasons and the facts and circumstances supporting them for believing that deceased would kill her son. As to this, the record is this: Defendant was asked: "Q. What made you think he would kill your boy?" She answered, without objection: "A. Why, he had him in the corner." Thereupon the State objected that this was incompetent, irrelevant and immaterial,

7. HOMICIDE: defense of another: evidence: belief of accused: reasons for belief: conclusions.

and called for the opinion and conclusion of the witness as distinguished from facts. The court sustained the objection, saying that it was done "more particularly (as to) the latter part of that objection." To the question what reason defendant had for believing deceased would kill her son, the objection that it called for a conclusion as distinguished from the facts was sustained. To the question what facts defendant knew that caused her to believe her husband would kill her son, objection "for all the reasons heretofore urged against the competency, irrelevancy and immateriality and remoteness that have been called for by previous questions" was sustained. The same objection was sustained to a question what circumstances she knew of in the previous relations between deceased and the son that caused her to believe deceased would kill her son.

She was then allowed to state, without objection, that she heard what the son said to deceased at the time of the homicide, and what she heard deceased say about killing him, and what she heard Mrs. Smiley say with reference to the razor, made her "so nervous." She added that, when she heard this, and heard Mrs. Smiley scream "He has got a razor," and heard deceased's threats, she knew her son was in danger, and that she was excited. Then, to the question whether there were other facts within her knowledge relative to the conduct of deceased towards the son at previous times which contributed to make her believe that her son was in danger at that time, an objection that it was immaterial and incompetent and called for remote and immaterial matters, was sustained.

Much that bears on this point is already said. In addition, it is said, in *State v. Doris* (Ore.), 94 Pac. 44, that reasons for carrying a weapon may be given. It has been held to be competent for defendant to explain why he was carrying the deadly weapon with which he did the killing. *State v. Kretschmar* (Mo.), 133 S. W. 16.

We cannot agree that a question like "What reason had

you for believing Mr. Minella would kill your son?'' was one which ''was clearly asking for the conclusion of the witness, and not for the relation of facts or incidents upon which the inference might be based that the son's life was in danger.'' In the gravity of her situation, defendant was put into a harassing position. If she contented herself with merely stat-. ing her belief that the husband would kill the son, argument could be made to the jury that this was merely her imagining, and that she had put nothing before the jury to make such belief seem justified and reasonable. But when she attempts to obviate this argument, she is met with the assumption that all she can say to justify her belief will, of necessity, be a conclusion. Assuming that, notwithstanding general and well-settled rules, she might not speak on this question by way of conclusion, it was still required that her answer, which on its face called for no conclusion, should be received, and, if it proved vulnerable to that objection, that it then be elimi-nated by motion or by instruction.

## 2.

In defense of the exclusion of the statement that she thought deceased would kill her boy because he had him in the corner, the State merely says this: that it objected to the question as incompetent, irrelevant and 8. TRIAL: recep-tion of evi-dence: objec-tions to answer without motion to strike: effect. immaterial, and calling for the opinion and conclusion of the witness as° distinguished from the facts; and the objection was sus-tained, especially the latter part of it, ''but there was no motion to strike, and the evidence was not removed in any way from the consideration of the jury, so that the witness was permitted without objection to state her belief that the deceased was about to kill her son.''

A successful motion to strike is not the only thing that removes evidence from the record; and we cannot agree that, though this objection was made and sustained in the pres-

ence of the jury, it still had the testimony.   See *Ford v. Dilley,* 174 Iowa 243.

V.   On re-examination, the witness T. B. O'Brian testified that defendant was not there at any time during the inquest, that she asked witness to take possession of everything, and that he remembered the conversa-

9. HOMICIDE: malice aforethought: lack of malice: evidence.

tion he had with her.   Thereupon, this question was asked: "And she gave you some directions, didn't she, with reference to the disposition of the body."   To this, the objection that it was immaterial was sustained.   The question was then asked whether, on the afternoon immediately after the shooting, defendant made some suggestion to witness about how the body should be put away.   The same objection was sustained to this.

It is insisted that the conversation inquired for was a part of the *res gestæ,* and that, on the question of malice, defendant had the right to prove that, immediately following the homicide, she insisted that the body of the deceased be suitably prepared for burial.   It is urged that this was admissible under the rule that malice or intent may be shown by subsequent conduct, which includes any unseemly conduct toward the body of the deceased or any indignity offered it by the accused (6 Encyc. of Ev., page 635) ; and anything should be considered which is in conflict with the lack of remorse or sympathy which characterizes the deliberate murderer, such as that accused at once commenced deploring and interposing excuses for the act and to apply such simple remedies to restore the person as were within his power (*Silgar v. People,* 107 Ill., at 574) ; and our attention is called to a case which holds that it is admissible that defendant said, 5 or 6 minutes after the affray:

"I am afraid I have cut him bad.   I didn't aim to do it. Lor, what will I do?   Won't you go for a doctor?   I will pay for it."

Notwithstanding, we are satisfied that asking an outsider to take possession of everything, and directions "with reference to the disposition of the body" and "some suggestions to you about how the body should be put away" are not available to the defendant who made them, even though they were made soon after the homicide. We agree with the State that the testimony was irrelevant and immaterial. We are not shaken in our conclusion that the arrangements as to the burial were immaterial, because counsel for appellant confesses from knowledge "how difficult it is to be accurate concerning the sordid details of life while entranced with the allurements of exalted public station," nor by his claim that, "in the stress of other and more fascinating engagements, they (counsel for the State) have overlooked the record." The record has been fully brought to our attention, and our aforesaid conclusion rests upon that.

VI. Frank Hoskinson testified that he heard the report of the shots; that, not long after, he saw the defendant; that she was with a Mr. Jones; that they met her coming down the road a little ways; and that she said she had done the shooting.

**10. EVIDENCE: acts, declarations and conversations: introduction of part: effect.**

On cross-examination, the witness was asked whether defendant did not say there "that she had to do what she had done to protect her son." Answer was excluded on the objection that it was not proper cross-examination.

Under Code Section 4615, when a part of a conversation is received, all on the subject should be received; and citations for appellant sustain and apply such statute provisions.

We must, therefore, concede that the witness should have been permitted to answer. We may further assume that the answer would have been part of the *res gestæ*. But the error was harmless, because defendant called

**11. APPEAL AND ERROR: harmless error: erroneous exclusion of evidence.**

this witness later, and did not then attempt to get what had in the cross-examination been refused her.

*State v. Rutledge,* 135 Iowa 581, relied on by the appellant, is readily distinguishable, though appellant contends it is conclusive. There, a witness for the State was allowed to make a statement, and the defendant was, on cross-examination, not allowed to inquire whether he did not state in that same connection, and as a part of the same conversation, that he was compelled to do so for his own protection. The defendant could not be compelled to cure the error in cross-examination by calling the State's witness, who might be hostile. In this case, the defendant voluntarily and generally called the same witness. If she is without what the cross-examination would have supplied, it is due to the fact that she did not interrogate her own witness upon the point. That is to say, if anything favorable was excluded on the cross-examination, nothing prevented its being elicited when the same witness was called by the defense. The differentiation attempted by the appellant as to *Davis v. Simma,* 14 Iowa 154, is not tangible. If in that case the error was cured by a permission to call a witness, it surely was obviated where, as here, with or without permission, the witness was called. Disposing of the point as we do, we are not concerned with cases like *Upton v. Knoll,* 32 Iowa 121, and *Glassman v. Chicago, R. I. & P. R. Co.,* 166 Iowa 254, 261, cases which favor liberal cross-examination and hold that, ordinarily, a refusal to allow cross-examination on relevant matters is ground for reversal. If, as is said in the reply, "the evidence sought from Hoskinson would have been of immeasurable value to the defendant," full opportunity to have this valuable testimony was accorded. We are unable to see why "it could be conveyed to the jury through no other avenue than the proposed cross-examination."

VII. Instruction 5, offered and refused, presents the claim—and one case from Florida, one from Texas and nine

of our own cases sustain it—that, on evidence that defendant acted in defense of her son, the burden is on

12. HOMICIDE: defense of another: evidence: burden of proof.

the State to show beyond a reasonable doubt that she was not acting justifiably upon reasonable and honest apprehension that what she did was necessary to save the son.   Appellant errs in the statement in reply that, because this is good law, the whole question is, "Must we show that she did act in defense of her son, or must the State show that she did not act in defense of her son?"   The question is whether the court did not in full effect charge what is the essence of the instruction refused.   Part of the first step is found in a declaration in Instructions 27, 28, 30 and 31, in effect that the shooting was justified if done upon reasonable though mistaken apprehension that it was necessary to save the son.   Then comes a charge that the State must overcome the general denial effected by plea of not guilty, with evidence showing guilt beyond a reasonable doubt; then No. 17, that only an assault which is without justification raises an inference of intent to kill.   In Instruction 22, dealing with murder in the second degree, it is charged that, to sustain a conviction for it, it must be found beyond a reasonable doubt, among other things, that the assault, shooting and killing were done by the defendant unlawfully, feloniously and with malice aforethought, without justifiable cause or lawful excuse.   The same thought is embodied in No. 25, in dealing with manslaughter. Finally, in Instruction 32, the jury is charged that defendant is not required to establish that, at the time of the alleged homicide, in whatever she did do, if anything, she was acting in self-defense, but the burden is on the State to establish beyond a reasonable doubt that she was not acting in self-defense; and that, if the State has failed in this respect, or if, upon a consideration of all the evidence, including that offered upon the defense of self-defense, the jury has reasonable doubt of guilt, there should be a verdict of not guilty.

## 2.

Nine of our cases, and one from Louisiana, present with much amplification the undoubted proposition that conflicting instructions cannot be sustained, especially where the one that is erroneous is unequivocal, while the one claimed to cure is general or vague. We find nothing in the instructions to which this law rule is applicable.

VIII.   We have carefully examined the very large number of authorities cited upon elementary propositions involved in the rules on when testimony is received or not received as part of the *res gestæ*. They satisfy us, as

13. EVIDENCE: *res gestæ:* ultimate test: spontaneity: logical relation.

we were satisfied before the examination, that the close connection in time between the statement and the act of which it is said to be a part is an element for consideration; that being close in point of time, however, is not all of the basis for receiving such evidence, and that the ultimate test is spontaneity and logical relation to the main event; that the tendency of the modern cases is to be liberal in the reception of such testimony; and that declarations are not to be rejected as part of the *res gestæ* merely because a third person instead of the accused makes the statement.

We may pass these abstractions and proceed with the concrete question. The jury could find that Nellie Smiley, when deceased fell to the floor dead, screamed that her mother had killed him; that she hastened immediately

14. EVIDENCE: *res gestæ:* improper limitation: impeachment.

out of the house to Hoskinson's home, a block distant; that there, in great excitement, she declared that, when deceased was shot, he was attempting to kill Charley with a razor; that she took the razor from his hand and had lost it in the street on her way to the Hoskinsons. The razor belonging to deceased was searched for and found on the street that Nellie had traversed to reach the Hoskinsons. If the jury believed it, she confirmed these statements later, and in a calmer mood. There

was the testimony of others which, if believed, established to be true what Mrs. Smiley had declared to the Hoskinsons. The Hoskinsons, Frank and Nora, testified to the declaration Mrs. Smiley made to them, directly after she had run to their house from the place of and immediately after the commission of the homicide. When a witness, Mrs. Smiley in effect testified that she had not made these declarations. The court charged on the theory that what the witness had said to the Hoskinsons might be considered by them as impeachment— that is to say, impeachment by showing that the witness had, out of court, made statements differing from her testimony. This is, of course, right. If the witness testified to a state of facts, and the declarations made to the Hoskinsons were contrary to her testimony, those declarations were receivable thus to impeach her; but the court erred in limiting the declarations and the statements of Smiley or of the Hoskinsons as to what declarations Mrs. Smiley made, to being impeaching. A statement which is confessedly made under such circumstances as to be part of the *res gestæ* would, if differing from the testimony given by the declarant, be receivable in impeachment of that testimony. But it would be more than impeachment. If the jury believed that the declarations were made, and if they were part of the *res gestæ*, then they were receivable not only in impeachment, but also as substantive evidence of the matters stated. The court took the position that although the witness were believed to have screamed out, under conditions that excluded premeditation, that deceased was about to kill Charley with a razor, and witness took it away from him, and denied on the witness stand the having made such a statement, the statement itself would merely go to credibility. If it was part of the *res gestæ,* it did more than that. It permitted the jury to consider it on the question whether it was true in fact that deceased thus assaulted the son with a razor, and that taking it away from him alone prevented the consummation of the assault.

IX. Six cases are cited for the proposition that the defense of alibi should not be disparaged by the court; one text book, to define the limits beyond which disparaging an alibi may not properly go; two others condemn the disparagement of classes of testimony other than alibi. These are all urged for the proposition that Instruction 37 improperly disparages the defense of self-defense. So far as instructing on alibi is concerned, this court permits that disparagement which the cases cited by appellant condemn. See *State v. Rowland,* 72 Iowa 327; *State v. Blunt,* 59 Iowa 468; *State v. Worthen,* 124 Iowa 408.

15. CRIMINAL LAW: instructions: advice and caution: disparagement of defense: self-defense.

The State urges that *McIntosh v. State* (Ind.), 51 N. E. 354, completely sustains the instruction here complained of. We think that, in so far as it does this, it is done by way of dictum, but we are inclined to fully approve that dictum, which is that:

"While the trial court ought not in any manner, in its charges to the jury, to disparage or cast suspicion upon any legitimate defense interposed in an action, still, if necessary in the interest of justice, it is certainly the right and duty of the judge to give to the jury such advice and such caution as will aid them in arriving at a true and just decision in the case."

The State does not cite *State v. Piernot,* 167 Iowa 353, upon this point, but we think it is a full approval of Instruction 37. In that case, instructions putting the burden on the State to show that the defendant did not act in self-defense were given, and then it was charged:

"The defense of self-defense, and the evidence relating thereto, should be carefully scrutinized and considered and weighed by the jury to the end that if an accused was in fact acting in self-defense he should not be found guilty, but if he was not acting in self-defense, then a due regard for the ends of justice and peace and welfare of society demand that persons guilty of crime may not make use of that plea as a means

of defeating justice, and to protect him from criminal responsibility for a violation of the criminal statutes of our state.''

The instruction complained of does in no substantial regard differ from the one approved in the *Piernot* case, and we are content with the holding of that case.

X.   Instruction 10, refused, is that evidence has been introduced tending to show that, immediately after the shooting, one Charles Tovrea was seen on the premises with a revolver in his hand; that he was subsequently accused of the murder, and has fled the jurisdiction of the court.

16. CRIMINAL LAW: defenses: indirect extrajudicial confessions of another.

It is the contention of the appellant that, because flight is evidence of guilt, or at least may be evidence tending to connect accused with the offense, confessions, if understandingly made, etc., are evidence whose weight is for the jury; and, because it may be shown that one charged with a crime told a falsehood in denying it, that, therefore, the court should have given said instruction.  Flight and the like are receivable against the accused, and his confession may be receivable.  But, notwithstanding the criticism of Mr. Wigmore, it seems well settled that this does not apply to extrajudicial confessions by a third person.  *Donnelly v. United States*, 33 Sup. Ct. Rep. 449, point 12, and *State v. West* (La.), 12 So. 7, which latter holds that, where a third person, some time after the commission of the homicide, declares that he killed the deceased, such declaration must be rejected as hearsay, if the party making it had escaped.  Both are cited by appellant.

If a confession by a third person, whether made outright or deducible from conduct, will not avail the accused, evidence tending indirectly to establish a confession by the third person cannot aid the accused.

It is true that this does not result in justifying the exclusion of testimony tending to show that another than the defendant is guilty; and that, if there is a reasonable doubt which one of several parties is guilty, they must all be

acquitted, for which propositions the appellant cites authorities. But as to this, we have to say that because this may be the law it does not follow that something in the nature of a confession by third persons is evidence that someone other than the accused is guilty, or raises a reasonable doubt as to his guilt. See *State v. Piernot*, 167 Iowa 353.

XI. Instruction 9, refused, is that evidence has been introduced tending to show that, immediately after the shot was fired resulting in the death, one Cole Tovrea was seen in possession of the revolver, Exhibit 1; that shortly thereafter he had in his possession and hid the cartridges, Exhibit 4, introduced in evidence; that he was subsequently charged with the murder of Victor, and. thereafter denied having had possession of either of the articles referred to in this instruction; and that, if the jury believes he had in his hands the revolver in question at the time when and in the room where Victor lost his life, and that shortly. afterwards he hid and concealed it and the cartridges in question, and subsequently denied the possession of either of said articles, then such facts are proper to be considered in determining who fired the fatal shots; and if, from such evidence, when considered in connection with all the other testimony, a reasonable doubt is entertained as to who fired the fatal shots, there should be an acquittal.

17. Homicide: instructions: guilt of one other than accused: attendant acts.

We think there was evidence to which this instruction was applicable, and, as we understand it, the answer of the State is that the defendant admitted that she did the killing and rested her defense wholly upon justifying the homicide; that this was the theory of the trial; and that, therefore, it was not error to refuse to submit whether someone other than defendant may not have done the killing. The- appellant contends that the admission does not go so far, and not beyond admitting the firing of shots which may or may not have caused the death. In our opinion, the strongest that it may be put for the State is that the jury might have found that the defendant

had admitted the killing, and think that, under the circumstances, this instruction should not have been refused.

XII. The record here is in such condition as to presentation as that we should not pass upon the claim of the appellant that there was no evidence justifying submitting murder in the first degree and murder in the second degree, and that error was committed in submitting these to the jury.

For the errors pointed out in Divisions 2, 3, 4, 8 and 11, the judgment must be—*Reversed.*

EVANS, C. J., LADD and GAYNOR, JJ., concur.